Form **843** (Rev. January 1997) Department of the Treasury Internal Revenue Service

# Claim for Refund and Request for Abatement

▶ **See separate instructions.**

OMB No. 1545-0024

*Use Form 843 only if your claim involves **(a)** one of the taxes shown on line 3a or **(b)** a refund or abatement of interest, penalties, or additions to tax on line 4a.*

- *An overpayment of income taxes;*
- *A refund of fuel taxes;*
- *An overpayment of excise taxes reported on Form 720, 730, or 2290 (see **General Instructions**).*

Please type or print

| | |
|---|---|
| Name of claimant<br>**ESTATE OF RANKIN M. SMITH, SR.** | Your social security number<br>**252 : 36 : 6181** |
| Address (number, street, and room or suite no.)<br>**C/O SUNTRUST BANK, ATLANTA P.O. BOX 4655, DEPT. 251** | Spouse's social security number<br>: : |
| City or town, state, and ZIP code<br>**ATLANTA, GA 30302** | Employer identification number<br>**58 : 6354904** |
| Name and address shown on return if different from above | Daytime telephone number<br>**( 404 ) 588-7444** |

**1** Period—prepare a separate Form 843 for each tax period
From **DATE OF DEATH** , 19 , to **AUGUST** 30 , 2002

**2** Amount to be refunded or abated $ **12,591,295***

**3a** Type of tax, penalty, or addition to tax:
☐ Employment ☑ Estate ☐ Gift ☐ Excise (unless reported on Form 720, 730, or 2290—see instructions.)
☐ Penalty—IRC section ▶ ____________

**b** Type of return filed (see instructions):
☑ 706 ☐ 709 ☐ 940 ☐ 941 ☐ 943 ☐ 945 ☐ 990-PF ☐ 4720 ☐ Other (specify)

**4a** Request for abatement or refund of:
☐ Interest caused by IRS errors or delays (if applicable—see instructions).
☐ A penalty or addition to tax as a result of erroneous advice from the IRS.

**b** Dates of payment ▶

**5** **Explanation and additional claims.** Explain why you believe this claim should be allowed, and show computation of tax refund or abatement of interest, penalty, or addition to tax.

**SEE ATTACHED "SUMMARY STATEMENT OF GROUNDS IN SUPPORT OF CLAIM FOR REFUND OF FEDERAL ESTATE TAXES AND ACCRUED DEFICIENCY INTEREST"**

***This amount represents the amount of federal estate tax to be refunded only. However, this Claim for Refund is filed in order to not only obtain a refund of federal estate taxes, but also to obtain a refund of the accrued deficiency interest paid by taxpayer, along with interest on such amounts as provided by law, and any other amounts legally refundable.**

**Signature.** If you are filing Form 843 to request a refund or abatement relating to a joint return, both you and your spouse must sign the claim. Claims filed by corporations must be signed by a corporate officer authorized to sign, and the signature must be accompanied by the officer's title.

Under penalties of perjury, I declare that I have examined this claim, including accompanying schedules and statements, and, to the best of my knowledge and belief, it is true, correct, and complete.

SunTrust Bank, Co-Executor, by
Signature (Title, if applicable. Claims by corporations must be signed by an officer.) Date

See attached pages for signatures and declarations of individual Co-Executors
Signature Date

Under penalties of perjury, I declare that I have examined this claim, including accompanying schedules and statements, and, to the best of my knowledge and belief, it is true, correct, and complete.

**<u>Form 843 – Claim for Refund and Request for Abatement</u>**

**Estate of Rankin M. Smith, Sr.**
**SSN: 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**
**Date of Death: October 26, 1997**
**c/o SunTrust Bank, Atlanta**
**PO Box 4655 Dept. 251**
**Atlanta, GA 30302**

**EIN: 58-6354904**

**<u>Attachment One</u>**

Additional Executor's Signature

By: [signature]
Taylor W. Smith

Title: Co-Executor

Date: Aug. 22 2002

Under penalties of perjury, I declare that I have examined this claim, including accompanying schedules and statements, and, to the best of my knowledge and belief, it is true, correct, and complete.

**Form 843 – Claim for Refund and Request for Abatement**

**Estate of Rankin M. Smith, Sr.**
**SSN: 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**
**Date of Death: October 26, 1997**
**c/o SunTrust Bank, Atlanta**
**PO Box 4655 Dept. 251**
**Atlanta, GA 30302**

**EIN: 58-6354904**

**Attachment Two**

Additional Executor's Signature

By: Rankin M. Smith, Jr. [signature]
Rankin M. Smith, Jr.

Title: Co-Executor

Date: 8-27-02

**ESTATE OF RANKIN M. SMITH**
**DECEDENT'S SSN: 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**
**ESTATE'S EIN: 58-6354904**

## SUMMARY STATEMENT OF GROUNDS IN SUPPORT OF CLAIM FOR REFUND OF FEDERAL ESTATE TAXES AND ACCRUED DEFICIENCY INTEREST

Rankin M. Smith, Sr. ("Mr. Smith") died on October 26, 1997. The Estate of Rankin M. Smith, Sr. (the "Estate") timely filed Form 706, United States Estate (and Generation Skipping Transfer) Tax Return, on January 26, 1999, pursuant to extension. A copy of this Form 706 is attached as Exhibit A. Form 706 subsequently was amended on July 26, 1999 to reflect a special allocation of a portion of Mr. Smith's unallocated generation-skipping tax exemption, which resulted in changes only to Schedule R to Form 706. A copy of Schedule R as amended is attached as Exhibit B. (The estate tax return, as so amended, is referred to herein as "Form 706.") Because the principal asset owned by the Estate was 12,424 shares of common stock (the "Shares") in The Five Smiths, Inc. (the "Company"), a family controlled corporation which owned and operated the Atlanta Falcons NFL football team, the Estate chose to defer the payment of its estate tax obligation, and accordingly elected to pay its estate tax obligation in ten (10) equal annual installments under Section 6166 of the Internal Revenue Code (the "Code").

At the time of Mr. Smith's demise, the Shares represented 32.65% of the equity of the Company. On Form 706 (at Item 11 of Schedule B), the Estate, based on an appraisal performed by Houlihan Lokey Howard & Zukin ("Houlihan Lokey"), a copy of which is annexed hereto as Exhibit C, valued the Shares at $25,370,000. Thereafter, on January 25, 2002, the Estate, after receipt of valuation reports from Standard & Poor's dated January 16, 2002, annexed hereto as Exhibit D-1 (which addresses the value of the Shares) (the "S&P Report") and Exhibit D-2 (which addresses the application of a key man discount in valuing the Company), filed a refund

claim (the "Initial Refund Claim"), claiming a reduction in its taxable estate by reason of a revised fair market value of the Shares of $20 million as compared to the Houlihan Lokey value of $25,370,000. The Estate also filed the Initial Refund Claim to report an increase of $7,360,733 in the Estate's administrative expenses due to additional interest payments, legal fees, executors' commissions, and miscellaneous expenses not previously reported on Form 706.

In addition to the value of the Shares, there is also an issue with respect to certain indebtedness claimed on Form 706. Mr. Smith was the general partner of Falcons Nest I, Ltd., a Georgia limited partnership ("Falcons Nest"), which owned certain assets, including real property utilized by the Atlanta Falcons football team as its training facility. The training facility was valued as of October 26, 1997 at $6,710,000 based upon an appraisal by Childers Associates (copies of their initial appraisal report and supplemental letter are annexed hereto as Exhibits E-1 and E-2 (the "Childers Report")). The other assets of Falcons Nest were valued at $762,499, resulting in a total asset value of $7,472,499 ($6,710,000 plus $762,499). However, Falcons Nest's liabilities totaled $11,543,811, so that, as of October 26, 1997, its liabilities exceeded its assets by $4,071,312 ($11,543,811 less $7,472,499) ("Excess Falcons Nest Liability"). Accordingly, the Estate reported this Excess Nest Liability as a debt of Mr. Smith, at item 28 of Schedule K of Form 706.

On January 28, 2002, after the Estate filed the Initial Refund Claim, the Estate received a Notice of Deficiency from the Internal Revenue Service (the "Service") dated January 25, 2002 (the "Notice of Deficiency"), a copy of which is annexed hereto as Exhibit F.[1] In the Notice of Deficiency, (i) relying on an appraisal by Willamette Management Associates ("Willamette") (a

[1] The Service initially sent a Notice of Deficiency to the Estate dated January 24, 2002, and then sent a second Notice of Deficiency dated January 25, 2002, in which the Service corrected errors present in the initial Notice of Deficiency. All references to the Notice of Deficiency herein are to the second Notice of Deficiency.

copy of its report is annexed hereto as Exhibit G), the Service determined that the fair market value of the Shares was $48,685,020, and (ii) based on a report by Terry A. White, a Service Valuation Engineer (the "White Report"), which valued the Atlanta Falcons training facility at $8,203,000, the Service reduced the Excess Falcons Nest Liability claimed by the Estate by $1,493,000 ($8,203,000 - $6,710,000) from $4,071,312 to $2,578,312. A copy of the White Report is annexed hereto as Exhibit H.

As a result of the aforementioned two adjustments ("Adjustments"), the Notice of Deficiency asserted a transfer tax deficiency of $13,644,400.[2] On March 1, 2002 the Estate (i) paid the Service a total of $19,290,867, consisting of $16,159,613 in federal estate tax and $3,131,254 of accrued deficiency interest (a copy of the transmittal letter (with a receipt stamp thereon) is attached as Exhibit I) and (ii) paid the Georgia Department of Revenue a total of $4,392,387, representing $3,050,289 in Georgia estate tax and $1,342,148 of accrued deficiency interest (a copy of the transmittal letter (with a receipt stamp thereon) is attached as Exhibit J).[3] On March 21, 2002 the Estate paid the Florida Department of Revenue a total of $15,802, representing $10,846 in Florida estate tax and $4,956 of accrued deficiency interest (a copy of the transmittal letter is attached as Exhibit K).[4]

The payment of $19,290,867 to the Service represented (i) the Estate's best estimate of the full amount of tax and accrued deficiency interest (resulting from the Adjustments as well as

---

2 The transfer tax self-assessed by the Estate on Form 706 as originally filed was $9,750,765, of which $703,597 had been paid as of January 25, 2002.

3 After the Estate paid the additional Georgia estate taxes, the Estate determined that the amount of estate taxes owed to Georgia had been incorrectly calculated, and sought and obtained a refund in the amount of $129,177. This refund reduced the total amount of estate taxes paid to the Georgia Department of Revenue by the Estate from $6,093,363 to $5,964,186.

4 After the Estate paid the additional Florida estate taxes, the Florida Department of Revenue, by letter dated March 21, 2002, sent a refund to the Estate in the amount of $31,139 based upon the Initial Refund

interest accrued on the estate tax deferred under Code Section 6166) due pursuant to the Notice of Deficiency, reduced by (x) the additional credit for state death taxes allowable because of the Estate's payment of additional state estate taxes (which reduction is contemplated by item 14 of the computation of estate tax deficiency included in the Notice of Deficiency) and (y) deductions attributable to the payment (both on March 1, 2002 and prior to that date) to the Service of interest on the estate taxes deferred under Code Section 6166 and the payment to the Service and the Georgia Department of Revenue of accrued deficiency interest occasioned by the Adjustments, in the aggregate amount of $6,452,415 (the "Interest Payments"), and (ii) the remaining balance of the self-assessed transfer tax shown as due on Form 706.

Based on the grounds summarized herein, and in the Exhibits hereto, the Estate hereby claims a refund in the amount of $15,722,549 (which amount includes and gives effect to the adjustments set forth in the Initial Refund Claim), on account of the overpayment by the Estate of $12,591,295 in federal estate tax and $3,131,254 of accrued deficiency interest paid (collectively the "Estate Tax Overpayment"), together with interest on the Estate Tax Overpayment as provided by law, plus such other amounts as may be legally refundable.

The following chart sets forth the preliminary calculation and estimate of the federal estate tax and accrued deficiency interest to be refunded to the Estate:

---

Claim. This refund reduced the total amount of estate taxes paid to the Florida Department of Revenue by the Estate from $69,649 to $38,510.

**Preliminary Calculation and Estimate of Federal Estate Tax To Be Refunded**

| | Description Per Form 706 | Per Form 706 | Per Notice of Deficiency | Computation of Tax Payment Made by Estate on 3/1/02 Per Notice of Deficiency | Computation of Form 843 Refund Amount[a] |
|---|---|---|---|---|---|
| 1 | Value of the Estate's Shares | $25,370,000 | $ 48,685,000 | $ 48,685,000 | $ 20,000,000 |
| 2 | Other Estate Assets | 10,781,175 | 10,781,175 | 10,781,175 | 10,781,175 |
| 3 | Total Gross Estate | 36,151,175 | 59,466,175 | 59,466,175 | 30,781,175 |
| 4 | Funeral and Administration Expenses | 2,976,821 | 2,976,821 | 9,429,236[b] | 10,337,554[c] |
| 5 | Liabilities of the Decedent | 5,226,101 | 3,733,101 | 3,733,101 | 5,226,101 |
| 6 | Other Allowable Deductions | 5,259,877 | 5,259,877 | 5,259,877 | 5,259,877 |
| 7 | Taxable Estate | 22,688,376 | 47,496,376 | 41,043,961 | 9,957,643 |
| 8 | Post-1976 Adjusted Taxable Gifts | 827,859 | 827,859 | 827,859 | 827,859 |
| 9 | Subtotal (line 7 + line 8) | 23,516,235 | 48,324,235 | 41,871,820 | 10,785,502 |
| 10 | Total Tentative Tax | 13,126,729 | 26,771,129 | 23,222,301 | 5,612,101 |
| 11 | Aggregate Post-1976 Gift Taxes Payable | 86,224 | 86,224 | 86,224 | 86,224 |
| 12 | Gross Estate Tax (line 10 – line 11) | 13,040,506 | 26,684,905 | 23,136,077 | 5,525,877 |
| 13 | Unified Credit Against Estate Tax | 192,800 | 192,800 | 192,800 | 192,800 |
| 14 | Federal Estate Tax (line 12 – line 13) | 12,847,706 | 26,492,105 | 22,943,277 | 5,333,077 |
| 15 | Credit For State Death Taxes | 3,096,940 | 7,066,220 | 6,002,696[d] | 1,061,162 |
| 16 | Estate Tax Paid 7/26/98 | 703,597 | N/A | 703,597 | 703,597 |
| 17 | Estate Tax Paid 3/1/02 | N/A | N/A | 16,159,613 | 16,159,613 |
| 18 | Estate Tax Overpayment (Deficiency) (line 15 + line 16 + line 17 – line 14) | (9,047,168) | (13,644,400) | (77,371) | 12,591,295 |
| | | | | **Form 843 Claim for Refund Requested** | **$12,591,295** |
| | | | | **Accrued Deficiency Interest** | **$ 3,131,254** |
| | | | | **TOTAL** | **$15,722,549** |

[a] The refund amount (i) reflects the reduced value of the taxable estate by reason of the reduction in value of the Shares from $25,370,000 to $20 million and the $7,360,733 increase in administrative expenses, as set forth in the Initial Refund Claim filed by the Estate on January 25, 2002, and (ii) gives effect to the payments, aggregating $23,683,254, made on March 1, 2002 by the Estate to the Service and the Georgia Department of Revenue.

[b] This amount includes $2,976,821 of funeral and administrative expenses reported on Form 706 and the Interest Payments of $6,452,415.

[c] This represents $2,976,821 of administrative expenses initially reported on Form 706 plus the $7,360,733 of additional administrative expenses set forth in the Initial Refund Claim.

[d] This state death tax credit amount is smaller than the credit amount computed by the Service in the Notice of Deficiency because the deduction of the Interest Payments described in footnote b, *supra*, reduces the amount of the taxable estate and thus the state death tax credit amount. Further, this state death tax credit amount reflects the total amount of unrefunded state death taxes paid by the Estate to Georgia ($5,964,186) and Florida ($38,510), and is somewhat smaller than the maximum state death tax credit amount allowable under Code Section 2011, which maximum amount is $6,033,834 for a federal taxable estate of $41,043,961. Accordingly, the Estate protectively claims a federal estate tax refund that takes into consideration the full amount of the state death taxes that are ultimately determined to be owed and are paid.

## ISSUES INVOLVED

The issues for resolution concern (i) the fair market value of the Shares, (ii) the fair market value of the training facility owned by Falcons Nest, and (iii) the deductibility of the additional administrative expenses claimed by the Estate.

## I. VALUE OF SHARES

On Form 706, the Estate valued the Shares based on the appraisal report of Houlihan Lokey. In this claim for refund, the Estate relies on the appraisal of Houlihan Lokey as supplemented by the S&P Report. The Service, in its Notice of Deficiency, relies on the Willamette Report. The difference between the $48,685,020 value determined by the Service and the $20 million claimed by the Estate is occasioned principally by the following:

### A. Franchise Value of Atlanta Falcons

The Estate claims that the value for the Atlanta Falcons National Football League franchise and related assets ("Franchise Value") was not in excess of $160 million as set forth in the S&P Report, whereas the Service asserts a Franchise Value of $193 million as set forth in the Willamette Report.[5] Each of the appraisals then determined the enterprise value of the Company by giving effect to the Estate's liabilities and other non-operating assets (including the proceeds of life insurance on Mr. Smith's life). As a result of these items, Willamette reduced its Franchise Value of $193 million by $8,340,751, to arrive at a fair market value of the equity of the Company on a marketable, controlling interest basis of $184,659,249. Standard & Poor's used Willamette's adjustments, reducing its Franchise Value of $160 million by $8,340,751, to determine an indicated value of 100% of the enterprise of $151,659,249, before consideration of

[5] Houlihan Lokey in its Report determined a value of $156.9 million for the Atlanta Falcons franchise. The Estate reserves the right to claim the Houlihan Lokey Franchise Value or such lower value, as it may

a key man discount. Thus the indicated enterprise value of the Company as determined by Standard & Poor's was $33 million less than the value determined by Willamette.

**B. Key Man Discount**

In determining the fair market value of 100% of the equity of the Company, Standard & Poor's deducted the amount of $18,389,000 from the enterprise value of the Company to reflect a key man discount occasioned by the loss of the Company's founder, Mr. Smith. Neither Houlihan Lokey nor Willamette addressed this key man discount issue in their respective reports.

**C. Discounts for Lack of Control and Lack of Marketability**

Prior to Mr. Smith's death, the Company had two classes of common stock issued and outstanding, Class A common stock and Class B common stock, which were identical in all respect other than voting power. The Class A common stock was entitled to 11.64 votes per share and the Class B common stock was entitled to one vote per share. Pursuant to Article VII of the Company's Articles of Incorporation, all of the outstanding shares of the Class A common stock owned by Mr. Smith were to be converted into shares of Class B common stock, on a one-to-one basis, (i) upon Mr. Smith's death, or (ii) at the time that Mr. Smith, prior to his death, sold or otherwise transferred for consideration his Class A common stock.

**1. Application of Code Sections 2703 and 2704**

At the time of his death, Mr. Smith owned 12,424 shares of Class A common stock, representing 81.75% of the Company's ordinary voting power and 32.65% of the Company's equity. The conversion of Mr. Smith's Class A common stock into Class B common stock upon his death resulted in a reduction in the ordinary voting power of Mr. Smith's equity from 81.75% to 32.65%. The Estate maintains that Mr. Smith's Shares are properly valued as Class B

---

prove. Houlihan Lokey adjusted the Franchise Value by $7.4 million to arrive at an enterprise value of $149.5 million.

common stock, and that Section 2704 of the Code does not change this result. The Service, relying on Section 2704, asserts that the Shares should be valued as Class A common stock.[6]

Under Section 2704(a)(1) a lapse in voting rights occurred with respect to Mr. Smith's Class A common shares upon his death as a result of their conversion to Class B common shares, and under Section 2704(a)(2) the amount of the transfer represented by the lapse which occurred at the time of his death "is equal to the excess (*if any*) of the value," (emphasis added), of Mr. Smith's Class A shares immediately prior to his death over the value of Mr. Smith's shares immediately after his death. As demonstrated in the Estate's memoranda, here, there is no excess value. As previously indicated, under Article VII of the Company's Articles of Incorporation, all of the outstanding shares of Class A common stock owned by Mr. Smith automatically converted into shares of Class B common stock, on a one-for-one basis, (i) upon a lifetime sale or other transfer of such shares by Mr. Smith or (ii) upon Mr. Smith's death. Thus, the value of Mr. Smith's shares in an arms' length transaction with an unrelated third party immediately prior his death would be the same as the value immediately after his death, because in <u>both</u> cases the Class A super-voting rights would "lapse." Accordingly, the lapse in voting power does not result in an increase in the value of Mr. Smith's gross estate since the price that Mr. Smith would have received for the Shares immediately prior to his demise would not be greater in amount than that which would have been realized by his Estate immediately after his demise.

**2. <u>Discounts for Lack of Control and Lack of Marketability</u>**

Assuming that the Shares should be valued as Class B common stock, Standard & Poor's accepts Houlihan Lokey's 30% discount for lack of control and 35% discount for lack of

---

[6] See <u>Exhibits L-1, 2 and 3</u>, which include two Memoranda of the Estate's legal counsel, Dow, Lohnes & Albertson, PLLC, which are incorporated herein by reference, and a Service Memorandum of September 24, 2001, which

marketability for the Shares valued as Class B common stock. If the Shares should be valued as Class A common stock, then under these circumstances Standard & Poor's utilized a 25% discount for lack of control and a 35% discount for lack of marketability. Houlihan Lokey in its Report utilized a 20% discount for lack of control and a 35% discount for lack of marketability for the Shares valued as Class A common stock. Willamette, in its Report, utilized a discount for lack of control of 5% and a discount for lack of marketability of 15% for the Shares if they were to be valued as Class A common stock, and a 15% discount for lack of control and 20% discount for lack of marketability if the Shares are to be valued as Class B common stock.

SUMMARY OF APPRAISALS

| | **Standard & Poor's** | **Houlihan Lokey** | **Willamette** |
|---|---|---|---|
| Atlanta Falcons Franchise Value | $160 million | $156.9 million | $193 million |
| Value of 100% of the Enterprise | $151.659 million | $149.5 million | $184.689 million |
| Key Man Discount | $18.389 million | — | — |
| Discount for Lack of Control: | | | |
| Estate Shares Valued as Class A Common Stock | 25% | 20% | 5% |
| Estate Shares Valued as Class B Common Stock | 30% | 30% | 15% |
| Discount for Lack of Marketability: | | | |
| Estate Shares Valued as Class A Common Stock | 35% | 35% | 15% |
| Estate Shares Valued as Class B Common Stock | 35% | 35% | 20% |

---

Memoranda respectively reflect the position of the Estate and the Service with respect to this issue.

**D. <u>Analysis</u>**

Code Section 2001(a) provides for a tax on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States. For Federal estate tax purposes, property includable in a decedent's gross estate is generally included at its fair market value on the date of the decedent's death. Code § 2031(a); Treas. Regs. § 20.2031-1(b). Fair market value is defined as the price at which property would change hands between a willing buyer and a willing seller, both persons having reasonable knowledge of all relevant facts and neither person being under a compulsion to buy or to sell. Treas. Regs. § 20.2031-1(b). Further, the highest price a willing buyer would pay is also the price that a willing seller wants. *Estate of Newhouse v. Commissioner*, 94 T.C. 193, 233, n.23 (1990). The willing buyer and the willing seller are hypothetical persons, instead of specific individuals and entities, and the characteristics of these imaginary persons are not necessarily the same as the personal characteristics of the actual seller or a particular buyer. *Estate of Bright v. United States*, 658 F.2d 999, 1005-1006 (5th Cir. 1981).

Section 2031 of the Code provides as follows:

> *(a) GENERAL RULE--The value of the gross estate of the decedent shall be determined by including to the extent provided for in this part, the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated.*

The relevant portions of the Treasury Regulations provide as follows:

Section 20.2031-1. . . . <u>valuation of property</u>

> *(b) <u>Valuation of property in general</u>. The value of every item of property includable in a decedent's gross estate . . . is its fair market value at the time of the decedent's death. . . . The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts . . . . The value is generally to be determined by ascertaining as a basis the fair market value as of the applicable valuation date of each unit of property. For example, in the case of shares of stock or bonds, such unit of property is generally a*

> *share of stock or a bond . . . . All relevant facts and elements of value as of the applicable valuation date shall be considered in every case.*

The "Indicated Value of Class B Shares" as determined on page 35 of the S&P Report properly reflects the fair market value of the Shares on October 26, 1997, namely, $20 million, and gives effect to and is consistent with the principles set forth in the quoted Treasury Regulation. Moreover, the S&P Report was prepared by qualified and recognized valuation experts and gives appropriate consideration to all of the elements required to be considered in stock valuations for federal tax purposes. On the other hand, for a number of reasons, including those set forth in the S&P Report, the Willamette Report does not properly determine the fair market value of the Shares.[7] Accordingly, the Estate maintains that the fair market value of the Shares for purposes of determining the Estate's estate tax liability is not in excess of $20 million.

## II. VALUE OF THE ATLANTA FALCONS TRAINING FACLITY

The principal assets of Falcons Nest as of the date of Mr. Smith's death were properties comprising the Atlanta Falcons training facility, which consisted of the assets listed on the chart below (hereinafter collectively the "Training Facility Properties"). The fair market value of each of the Training Facility Properties reflects the value determined by Richard S. Childers, MAI, of Childers Associates, an experienced Atlanta metropolitan area real estate appraiser, in a manner consistent with the principles of the Treasury Regulation quoted above. Mr. Childers valued the Training Facility Properties as follows:

---

[7] The S&P Report correctly concludes that (i) Willamette's application of the guideline transaction method to determine the value of the Atlanta Falcons franchise is not consistent with general valuation methodology, and (ii) because of its erroneous assumption of certain facts and a series of speculative and unsupported presumptions, the Willamette Report materially underestimated the lack of control and lack of marketability discounts applicable to the Shares.

| Summary of Value of Training Facility Properties Per Childers Report | |
|---|---|
| **Asset** | **Value** |
| Vacant Raw Industrial Land | $ 640,000 |
| Vacant Prepared Industrial Land | 1,270,000 |
| Motel Facility | 3,200,000 |
| Office Building | 1,600,000 |
| Health Club Facility | 0[8] |
| **Total** | **$6,710,000** |

The White Report, used by the Service, valued the Training Facility Properties at $8,203,000, reflecting the following values:

| Summary of Value of Training Facility Properties Per White Report | |
|---|---|
| **Asset** | **Value** |
| Vacant Raw Industrial Land | $ 875,000 |
| Vacant Prepared Industrial Land | 798,000 |
| Motel Facility | 3,672,000 |
| Office Building | 1,600,000 |
| Health Club Facility | 1,258,000 |
| **Total** | **$8,203,000** |

The White Report is not an independent appraisal of the Training Facility Properties, but rather is a review of the Childers appraisal. In conducting his review, Mr. White viewed the properties only from the outside and approximately three years after the valuation date. In his Report, Mr. White concluded that the Childers appraisal methodology is sound, and simply disagreed with some of Mr. Childers' assumptions.

After the issuance of the White Report, Childers Associates prepared a letter to Thomas A. Shanks of SunTrust Bank (co-executor of the Estate), dated June 15, 2001, which responded to the critique in the White Report. Childers Associates correctly concluded that (i) Mr. White failed to consider the poor interior design and condition of the health club facility, as well as its

[8] Childers valued the 8.066 acres of land associated with the Health Club Facility as part of the Vacant Prepared Industrial Land, and concluded that the health club building itself did not contribute to the overall value of the property.

lack of windows, in determining to value the facility based on use as office space without extensive renovations, (ii) Mr. White failed to take into account competitive market conditions in determining to increase the value of the motel facility, (iii) additional raw industrial land sales identified by Mr. White either supported the Childers valuation or in one case was not comparable, and (iv) Mr. White failed to consider the poor grade and lack of visibility of the Prepared Industrial Land in increasing its value. The Estate thus maintains that the correct value of the Training Facility Properties is no more than $6,710,000 and that therefore the correct amount of the Excess Falcons Nest Liability is no less than the amount reported at item 28 of Schedule K of Form 706, namely $4,071,312, and not $2,578,312 as asserted by the Service.

## III. DEDUCTIONS PURSUANT TO SECTION 2053 OF THE INTERNAL REVENUE CODE

On Form 706, the Estate claimed a deduction for funeral expenses and administration expenses totaling $2,976,820.89. These expenses included administration expenses paid or incurred at the time Form 706 was filed and estimates of additional administration expenses to be paid or incurred in the future. The amounts deducted on Form 706 are set forth on Schedule J and summarized in the following chart:

| Funeral and Administration Expenses Claimed on Form 706 | | |
|---|---|---|
| **Description** | **Amount Paid or Incurred as of Filing Form 706** | **Amount Estimated Through Completion of Administration** |
| Funeral Expenses | $ 25,063.82 | $ 0 |
| Executors' Commissions | 0 | 233,000.00 |
| Attorneys' Fees | 1,110,916.29 | 600,000.00 |
| Accountants' Fees | 0 | 0 |
| Appraisal Fees | 97,071.74 | 0 |
| Interest Expense | 714,545.85 | 0 |
| Other Miscellaneous Expenses | 196,223.19 | 0 |
| **Totals** | **$2,143,820.89** | **$833,000.00** |

**Grand Total of Funeral and Administration Expenses Claimed on Form 706: $2,976,820.89 ($2,143,820.89 plus $833,000)**

Through January 17, 2002,[9] the Estate paid or incurred administration expenses that in some cases were already in excess of the estimates of certain categories of expenses listed on Form 706. In addition to the amounts paid or incurred through January 17, 2002, the Estate will necessarily pay or incur additional administration expenses during the period starting on January 18, 2002, and ending at the time the Estate completes its administration and distributes all remaining assets to the Estate's beneficiaries. These administration expenses include additional interest expense (including interest on estate tax deferred under Code Section 6166), additional attorneys' fees (including those related to a complicated will contest), additional appraisal fees, additional accounting fees, and other expenses related to the administration of the estate and the preservation of its property.

The amounts paid or incurred through January 17, 2002, and the amounts the Estate estimates will be paid or incurred after that date and in the future exceed the amounts claimed on Form 706 by a total amount of $7,360,733. The difference between the amounts paid or incurred and the amounts estimated to be paid or incurred in the future in each category versus the amounts claimed on Form 706 are set forth in the following chart:

[9] The Estate's Initial Refund Claim, filed on January 25, 2002, used January 17, 2002 as the cut-off date for administration expenses that were paid or incurred, and estimated such expenses for January 18, 2002 forward.

| Administration Expenses Claimed in Addition to the Administration Expenses Claimed on Form 706 | | |
|---|---|---|
| **Description** | **Additional Amount Paid or Incurred Through January 17, 2002** | **Estimated Additional Amount To Be Paid or Incurred From January 17, 2002 Through Completion of Administration** |
| Executors' Commissions | $ 0 | $ 738,280.88[10] |
| Attorneys' Fees | 3,115,531.39 | 150,000.00[11] |
| Accountants' Fees | 0 | 50,000.00 |
| Appraisal Fees | 0 | 50,000.00 |
| Other Expenses | 0 | 25,000.00 |
| Interest Expenses | 3,231,921.01[12] | *undetermined*[13] |
| **Totals** | **$6,347,452.40** | **$1,013,280.88** |

**Grand Total of Administration Expenses Claimed in Addition to the Administration Expenses Claimed on Form 706: $7,360,733.28 ($6,347,452.40 plus $1,013,280.88)**

These additional estate administration expenses in the above chart previously have not been claimed as deductions under Code Section 2053 (except in the Initial Refund Claim), and they have not been allowed as deductions by the Service. This refund claim seeks the allowance of deductions for expenses paid or incurred as of January 17, 2002, as well as those expenses

---

[10] This amount is in addition to the $233,000 of estimated executor's commissions listed on Form 706. Thus, the total amount of estimated post-January 17, 2002 executor's commissions is $971,280.88.

[11] This amount is in addition to the $600,000 of estimated attorneys' fees listed on Form 706. Thus, the total amount of estimated post-January 17, 2002 attorneys' fees is $750,000.

[12] This amount reflects an increase in interest paid or incurred on a SunTrust Bank line of credit and interest paid or incurred on estate taxes deferred under Code Section 6166. The interest on the line of credit has been computed through February 1, 2002, and the interest on the deferred estate taxes has been computed through February 28, 2002. The amount of the interest on the deferred estate tax is based on a taxable estate that gives effect to the reduction in value of the Shares from $25,370,000 to $20 million and an increase in administrative expenses in the amount of $7,360,733. The Estate protectively claims a deduction for the full amount of the interest on the amount of the deferred estate tax that is ultimately determined to be appropriate based on a final determination of the amount of the estate taxes owed by the Estate.

[13] The amount of any additional interest expenses deductible as administration expenses will be taken into account when such amounts are incurred or paid, and such additional interest expenses are intended to be covered by the refund claim contained herein.

reasonably estimated to be paid or incurred upon or before the termination of the Estate's administration.

A. **<u>Deductions Allowed Pursuant to Section 2053</u>**

The Estate claims a reduction of estate taxes attributable to the deduction of administration expenses paid or incurred and estimated as set forth in the preceding chart. The estate tax is based upon the amount of the "taxable estate." Code § 2001(a). In computing the taxable estate, the Code permits an estate to deduct administration expenses. Code § 2053.

Section 2053 of the Code provides as follows:

> *(a) GENERAL RULE. – For purposes of the tax imposed by section 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estate such amounts –*
>
> *(1) for funeral expenses;*
>
> *(2) for administration expenses;*
>
> *(3) for claims against the estate, and*
>
> *(4) for unpaid mortgages on, or any indebtedness in respect of, property where the value of the decedent's interest therein, undiminished by such mortgage or indebtedness, is included in the value of the gross estate,*
>
> *as are allowable by the laws of the jurisdiction, whether within or without the United States, under which the estate is being administered.*

The relevant portions of the Treasury Regulations provide as follows:

> Section 20.2053-1. *<u>Deductions for expenses, indebtedness, and taxes; in general</u>*
>
> *(a) <u>General Rule</u>. In determining the taxable estate of a decedent who was a citizen or resident of the United States at the time of his death, there are allowed as deductions under section 2053(a) and (b) amounts falling within the following two categories (subject to the limitations contained in this section . . .):*
>
> *(1) First category. Amounts which are payable out of property subject to claims and which are allowable by the law of the jurisdiction, whether within or without the United States, under which the estate is being administered for--*
>
> *(i) Funeral expenses;*

*(ii) Administration expenses; . . . .*

*As used in this subparagraph, the phrase "allowable by the law of the jurisdiction" means allowable by the law governing the administration of decedents' estates . . . .*

Section 20.2053-3. *Deduction for expenses of administering estate*

*(a) In general. The amounts deductible from a decedent's gross estate as "administration expenses" of the first category . . . are limited to such expenses as are actually and necessarily incurred in the administration of the decedent's estate; that is, in the collection of assets, payment of debts, and distribution of property to the persons entitled to it . . . . Expenditures not essential to the proper settlement of the estate, but incurred for the individual benefit of the heirs, legatees, or devisees, may not be taken as deductions. Administration expenses include:*

*(1) Executor's commission;*

*(2) Attorney's fee; and*

*(3) Miscellaneous expenses.*

*(d) Miscellaneous administration expenses. (1)Miscellaneous administration expenses include such expenses as court costs, surrogates' fees, accountants' fees, appraisers' fees, clerk hire, etc. Expenses necessarily incurred in preserving and distributing the estate are deductible, including the cost of storing or maintaining property of the estate, if it is impossible to effect immediate distribution to the beneficiaries. Expenses for preserving and caring for the property may not include outlays for additions or improvements; nor will such expenses be allowed for a longer period than the executor is reasonably required to retain the property.*

Where the final amount of estate administration expenses is not known, and not ascertainable prior to the expiration of the statute of limitations provided by Code Section 6511, Section 2053 of the Code permits an estate to deduct an estimate of the amount of such administration expenses that it expects to incur prior to the final distribution and winding up of the estate. The Treasury Regulations under Code Section 2053 specifically permit a deduction for estimated administration expenses. *See* Treas. Reg. §§ 20.2053-1(b)(3); -3(c)(1).

### B. The Estate's Additional Administrative Expenses Are Deductible Under Section 2053 and the Regulations Thereunder

The Estate reasonably has estimated the administration expenses set forth in this claim, and such administration expenses likely will be incurred and paid. The Estate's estimates are

based upon the best information currently available; however, the amounts may increase depending upon circumstances not currently foreseen. The actual administration expenses paid or incurred up to the date of final distribution of the Estate's assets, even if they exceed the reasonably estimated amounts of such expenses, are allowed as a deduction under Code Section 2053. The Estate hereby specifically requests that the amount of its estate tax obligation be determined by allowing as deductions all administration expenses actually paid or incurred through the final winding up of the Estate. *See* Treas. Reg. § 20.2053-1(b)(3) (refund allowed where the amount finally determined exceeds the estimated amount of administration expenses).

The administration expenses claimed herein are (i) allowable under the laws of the State of Georgia, (ii) have been or will be actually and necessarily incurred in the administration of the Estate within the meaning of Treasury Regulation section 20.2053-3(a),[14] (iii) have been paid or incurred or properly estimated, and (iv) have been timely claimed as a deduction by the Estate. Such administration expenses are allowable as a deduction in determining the taxable estate. Accordingly, the administration expenses are allowable as a deduction pursuant to Code Section 2053 in computing the Estate's final estate tax liability under Code Section 2001.

---

[14] The Estate reserves the right to assert that the requirements set forth in Treasury Regulation section 20.2053-3 or any other Treasury Regulation or authority for determining whether administration expenses are allowable as a deduction in determining the Estate's taxable estate are invalid if, and to the extent that, they are interpreted as imposing a requirement for deductibility in addition to the requirements enumerated as (i), (iii), and (iv) in the text.

**ESTATE OF RANKIN M. SMITH**
**DECEDENT'S SSN: 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**
**ESTATE'S EIN: 58-6354904**

**SUMMARY STATEMENT OF GROUNDS IN SUPPORT OF CLIAM FOR REFUND OF FEDERAL ESTATE TAXES AND ACCRUED DEFICIENCY INTEREST**

**LIST OF EXHIBITS**

| | |
|---|---|
| Exhibit A | Form 706, United States Estate (and Generation Skipping Transfer) Tax Return AS PREVIOUSLY FILED |
| Exhibit B | Schedule R to Form 706, United States Estate (and Generation Skipping Transfer) Tax Return AS PREVIOUSLY FILED |
| Exhibit C | Valuation Analysis of Mr. Smith's The Five Smiths, Inc. Shares Prepared by Houlihan Lokey Howard & Zukin |
| Exhibit D-1 | Supplemental Report Addressing the Value of Mr. Smith's The Five Smiths, Inc. Shares Prepared by Standard & Poor's |
| Exhibit D-2 | Supplemental Report Addressing the Application of a Key Man Discount in Valuing The Five Smiths, Inc. Prepared by Standard & Poor's |
| Exhibit E-1 | Appraisal of Falcons Nest 1, Ltd. Property Prepared by Childers Associates |
| Exhibit E-2 | Letter Response to IRS Review of Appraisal of Falcons Nest 1, Ltd. Prepared by Childers Associates |
| Exhibit F | IRS Notice of Deficiency dated January 25, 2002 |
| Exhibit G | Appraisal Report of Mr. Smith's The Five Smiths, Inc. Shares prepared by Williamette Management Associates |
| Exhibit H | Engineering and Valuation Report of Falcons Nest 1, Ltd. Property Prepared by Terry A. White, IRS Valuation Engineer (Appendix A to this Report is Exhibit E-1 above) |
| Exhibit I | Letter Transmitting Payment to the IRS dated March 1, 2002 |

| | |
|---|---|
| Exhibit J | Letter Transmitting Payment to the Georgia Department of Revenue Dated March 1, 2002 |
| Exhibit K | Letter Transmitting Payment to the Florida Department of Revenue Dated March 21, 2002 |
| Exhibit L-1 | Memorandum of Dow, Lohnes & Albertson Dated February 15, 2001 |
| Exhibit L-2 | IRS Memorandum Dated September 24, 2001 (on Form 886-A) |
| Exhibit L-3 | Memorandum of Dow, Lohnes & Albertson Dated October 9, 2001 |

**[ESTATE OF RANKIN M. SMITH
DECEDENT'S SSN: 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
ESTATE'S EIN: 58-6354904**

**SUMMARY STATEMENT OF GROUNDS IN SUPPORT
OF CLAIM FOR REFUND OF FEDERAL
ESTATE TAXES AND ACCRUED DEFICIENCY INTEREST]**

**[EXHIBITS NOT INCLUDED]**