ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
SEP 19 2007
U.S. COURT OF FEDERAL CLAIMS

ESTATE OF RANKIN M. SMITH, Sr., SUNTRUST BANK, TAYLOR W. SMITH, and RANKIN M. SMITH, JR., Co-Executors,

Plaintiff,

v.

THE UNITED STATES OF AMERICA,

Defendant.

Case No. 07-676 T

**COMPLAINT**

Plaintiff, the Estate of Rankin M. Smith, Sr., deceased, brings its Complaint against the United States of America for the recovery of estate taxes and related interest erroneously assessed and illegally collected by the Internal Revenue Service (the "Service"). As grounds for this Complaint, Plaintiff alleges as follows:

**THE PARTIES**

1. Plaintiff is the Estate of Rankin M. Smith, Sr., deceased, by its duly qualified and acting Co-Executors, SunTrust Bank, Taylor W. Smith, and Rankin M. Smith, Jr., ("Plaintiff" or the "Estate"). Rankin M. Smith, Sr. ("Mr. Smith" or "Decedent") died on October 26, 1997, a resident of Atlanta, Georgia. The Estate's Taxpayer Identification Number is 58-6354904. The Co-Executors' address is c/o SunTrust Bank, attention: Allen Venet, First Vice-President, 25 Park Place, Mail Code 213, Atlanta, Georgia 30303.

2. Defendant is the United States of America.

## JURISDICTION AND VENUE

3. Jurisdiction and venue are proper in this Court pursuant to 28 U.S.C. § 1346(a)(1) for the recovery of internal revenue tax erroneously and illegally assessed and collected by the Service.

## FACTS COMMON TO ALL COUNTS

4. In this action, the Estate challenges the following erroneous determinations by the Service:

(a) The Service erroneously determined the fair market value of shares held by Decedent at the time of his death in The Five Smiths, Inc. (the "Company") (the "Shares"), a closely-held Georgia corporation that owned the Atlanta Falcons National Football League ("NFL") franchise ("the Atlanta Falcons");

(b) The Service erroneously determined the fair market value of real property that was owned by Falcons Nest I, Ltd. ("Falcons Nest"), a Georgia limited partnership, and was used by the Atlanta Falcons football team as its training facility, thereby incorrectly reducing the amount of Decedent's indebtedness as a general partner in Falcons Nest; and

(c) The Service erroneously disallowed deductions for administration expenses paid or incurred by the Estate, including interest payments pursuant to the Estate's election under Section 6166 of the Internal Revenue Code, 26 U.S.C. § 6166 (the "Code").

As a result of the errors stated above, the Service erroneously increased Decedent's taxable estate, and improperly and unlawfully assessed and collected taxes and deficiency interest against the Estate in the amount of at least $17 million.

5. Section 2001(a) of the Internal Revenue Code, 26 U.S.C. § 2001(a) (the "Code"), provides for a tax on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States at the time of his or her death. Under Section 2031(a) of the Code, the amount of the tax is determined by reference to the fair market value of the property subject to the tax at the time of the decedent's death. In that regard, Section 20.2031-1(b) of the Treasury Regulations provides that "fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Finally, Section 2051 of the Code provides that a decedent's gross taxable estate is determined by deducting certain items, including estate administration expenses, from the gross estate.

6. On January 26, 1999, the Co-Executors timely filed the Estate's Form 706, United States Estate (and Generation Skipping Transfer) Tax Return (the "Original Return"), with the Internal Revenue Service Center, Atlanta, Georgia, on which it reported a taxable estate of $23,516,235, and a tax liability of $9,750,765. A copy of the Original Return is attached hereto as Exhibit A.

7. The Estate elected under Section 6166 of the Code to pay its estate tax obligation in ten equal annual installments. Between July 26, 1998 and July 26, 2001, the Estate made payments to the Service totaling $2,592,607.74.

8. On July 26, 1999, the Estate filed an Amended Form 706 (the "Amended Return"), to reflect a special allocation of a portion of Decedent's unallocated generation-skipping tax exemption, which resulted in changes solely to Schedule R of the Original Return. A copy of the relevant portion of the Amended Return is attached hereto as Exhibit B.

9. On January 25, 2002, the Estate filed a claim for refund on Form 843 in the amount of $5,478,849.74, plus interest allowable by law (the "First Refund Claim"), claiming a $12,730,733.23 reduction in the taxable estate based on (a) a $5,369,999.95 reduction in the previously reported fair market value of the Estate's Shares in the Company, and (b) an additional $7,360,733 deduction for administration expenses paid or incurred or reasonably estimated to be paid or incurred prior to the termination of the Estate since filing the Original Return. A copy of the First Refund Claim is attached hereto as Exhibit C.

10. On January 25, 2002, the Service issued a Notice of Deficiency asserting a deficiency in tax of $13,644,400, plus interest from the due date of the Original Return. A copy of the Notice of Deficiency is attached hereto as Exhibit D. As grounds for the deficiency, the Service erroneously determined that, as of the date of Decedent's death, the fair market value of the Estate's Shares in the Company was $48,685,020 rather than $25,370,000 as reported on the Original Return, resulting in a $23,315,000 increase in the taxable estate. The Service also erroneously determined that, as of the date of death, Decedent's personal liability as a general partner of Falcons Nest was $2,578,312 rather than $4,071,312 as reported on the Original Return, thereby increasing the taxable estate by $1,493,000. These erroneous determinations and adjustments by the Service resulted in an asserted increase in the taxable estate from $23,516,235 reported on the Original Return to $48,324,235, and an asserted increase in tax from $9,750,765 to $23,395,165.

11. On March 1, 2002, the Estate paid the Service a total of $19,290,867, intending to pay the full amount of the deficiency asserted by the Service.

12. On September 13, 2002, the Estate filed a second claim for refund on Form 843 (the "Second Refund Claim"), a copy of which is attached hereto as Exhibit E. At that time, the

Service had not acted on the Estate's First Refund Claim, and the Estate incorporated that claim into its Second Refund Claim. In the Second Refund Claim, the Estate claimed that it was entitled to a refund in the amount of $15,722,549, consisting of $12,591,295 in overpaid tax and $3,131,254 of deficiency interest, together with statutory interest thereon, plus such other amounts as may be legally refundable to the Estate.

13. By letter dated March 23, 2005, the Service issued a Notice of Claim Disallowance in which the First and Second Refund Claims were "jointly and separately" disallowed. A copy of the March 23, 2005 Notice of Claim Disallowance is attached hereto as Exhibit F.

14. By letter dated February 5, 2007, counsel for the Estate forwarded to the Service payment of an additional $1,385,838.61, consisting entirely of tax. A copy of this letter and payment are attached hereto as Exhibit G. This amount reflected the outstanding balance that the Service asserted remained due and owing on the Estate's account following the Service's abatement on or about January 26, 2007 in the amount of $2,890,810, which abatement resulted from the Service's increase of $2,890,810 in the credit allowable to the Estate for its payment of state death taxes. A copy of the Estate's TaxMod Form provided by the Service reflecting this balance is attached hereto as Exhibit H.

15. On February 23, 2007, the Estate filed a claim for refund on Form 843 in the amount of $1,385,838.61, plus interest allowable by law (the "Third Refund Claim"), a copy of which is attached hereto and incorporated herein as Exhibit I. In the Third Refund Claim, the Estate requested a refund of any amount of the $1,385,838.61 paid to the Service on February 5, 2007 that constitutes an overpayment when the deduction of the Estate's interest payments pursuant to its election under Section 6166 is allowed. The Estate also asserted protective refund

claims for, *inter alia*, any overpayment resulting once the Estate's final estate tax liability is computed with deductions for all administration expenses paid or incurred through the final winding up of the Estate, plus statutory interest.

16. By letter dated February 28, 2007, the Service issued a notice of Claim Disallowance in which the Third Refund Claim was disallowed. A copy of the February 28, 2007 Notice of Claim Disallowance is attached hereto as Exhibit J.

17. Except for the matters set forth in this Complaint, and adjustments previously agreed to, the Original Return as amended is correct as filed.

**CLAIM FOR RELIEF**

**COUNT I**

**CLAIM FOR TAX REFUND RELATED TO THE VALUE OF PROPERTY INCLUDED IN DECEDENT'S TAXABLE ESTATE**

18. The Estate repeats and realleges each and every allegation contained in paragraphs 1 through 17 of the Complaint as if fully set forth herein.

19. In determining the amount of Decedent's taxable estate, the Service incorrectly valued (a) the Shares in the Company held by Decedent at the time of his death and (b) the Training Facility Property owned by Falcons Nest, thereby erroneously increasing the taxable estate to $48,324,235 and the tax due thereon to $23,395,195. As a result of these erroneous determinations, the Estate is entitled to a refund in estate taxes and deficiency interest improperly and unlawfully assessed and collected, together with interest on the total overpayment, as set forth below.

**The Five Smiths, Inc.**

20. The Estate's principal asset was 12,424 shares of Class B Common Stock (the "Shares") in the Company, a closely-held family corporation that owned and operated the Atlanta Falcons.

21. The NFL awarded the Atlanta Falcons franchise to Mr. Smith on June 30, 1965, for $8.5 million. The Company was organized in 1965 under the laws of the State of Georgia, concurrent with the NFL's June 30 award of the franchise to Mr. Smith. The Company owned and operated the Falcon's franchise from that date until the sale in 2002 of the assets of the Company to a third party.

22. From the Company's inception in 1965 until Mr. Smith's death in 1997, Mr. Smith was responsible for the management and oversight of the Atlanta Falcons football team and the Company. On the date of his death, Mr. Smith was Chairman of the Board and Chief Executive Officer of the Company.

23. Immediately prior to Decedent's death, the Company had 13,050 shares of Class A Common Stock ("Class A Stock") and 25,000 shares of Class B Common Stock ("Class B Stock") issued and outstanding. Immediately prior to his death, Decedent owned 12,424 shares, or 95.2%, of the Class A Stock, with the remaining Class A stock held by family members or trusts for family members. Immediately prior to Decedent's death, the Class B Stock was owned 81.74% by Decedent's family members and 18.26% by unrelated third parties.

24. The Class A and Class B Stock were identical in all respects other than voting power. Accordingly, Decedent's Class A Stock represented approximately 32.65% of the equity of the Company, with the remaining 67.35% of the equity held by family members and third parties. The Class A Stock was entitled to 11.64 votes per share (86% of the voting power),

while the Class B Stock was entitled to one vote per share (14% of the voting power), and the stock of the Company generally voted as a single class. The Company's Articles of Incorporation provided, however, that the Class A Stock and the Class B Stock would each vote separately as a class in the case of (a) a merger, consolidation, sale, or other disposition of substantially all of the Company's assets or (b) the Company's dissolution. Under Sections 14-2-1003 and 14-2-1004 of the Official Code of Georgia, any amendments to this provision of the Company's Articles of Incorporation that would change these class voting rights also had to be approved by a majority vote of the affected class. This class voting provision remained in effect at the time of Decedent's death.

25. Additional rights of and limitations on the Class A Stock and Class B Stock also in effect at the time of Decedent's death came about as a result of further amendments to the Articles of Incorporation and the execution of a shareholders agreement in connection with the sales in 1991 of Class B Stock to third parties.

26. In 1990, certain of Decedent's children desired to sell a portion of their Class B Stock, representing approximately 12% to 18% of the Company's outstanding shares. John Imlay, a prominent Atlanta businessman who a few years earlier had approached Mr. Smith about buying the Falcons, expressed an interest in acquiring a portion of the offered interest. Tom Watson Brown, another prominent Atlanta businessman, also expressed an interest in acquiring a portion of the offered interest. Following extended negotiations among the parties beginning in December 1990, the board of directors and shareholders of the Company on March 25, 1991 executed Unanimous Consents approving Stock Purchase Agreements (a) among the Company, Mr. Imlay, and Rankin Smith, Jr. for the sale to Mr. Imlay of 2,283 shares of Class B Stock representing a 6% interest in the Company, and (b) among the Company, Mr. Brown, and

each of Rankin M. Smith, Jr., Carroll S. Walraven, and Dorothy A. Smith Knox, Decedent's children, for the combined sale to Mr. Brown of 2,283 shares of Class B Stock representing a 6% interest in the Company.

27. The sales of Class B Stock also were subject to review and approval by the NFL. By agreements dated March 27, 1991 and May 31, 1991 among the NFL, Mr. Imlay, and the Company and among the NFL, Mr. Brown, and the Company, respectively, the NFL approved the sales of Class B Stock subject to the conditions set forth in those agreements.

28. As set forth in the Stock Purchase Agreements and the Unanimous Consents of the board of directors and the shareholders of the Company, Mr. Imlay's and Mr. Brown's respective obligations to close on their purchases of the Class B Stock were conditioned on the Company amending Article VII of its Articles of Incorporation to provide for the automatic conversion of the Company's outstanding Class A Stock into shares of Class B Stock on a one-for-one basis upon either (i) the death of Mr. Smith, or (ii) a sale or transfer for consideration of any shares of Class A Stock during Mr. Smith's lifetime. The Company's Articles were so amended on March 27, 1991, and this automatic stock conversion provision remained in effect at the time of Decedent's death.

29. Also as set forth in the Stock Purchase Agreements, the obligations of Messrs. Imlay and Brown to close on their purchases of the Class B Stock were conditioned on the execution of a shareholders agreement among the Company and all of its shareholders (the "1991 Shareholders Agreement"), providing for certain restrictions on transfers of shares of the Company's stock and granting certain rights, as described below.

30. Under the 1991 Shareholders Agreement, Decedent and the other family shareholders agreed not to vote their shares in favor of amending the Company's Articles of

Incorporation to amend the provision relating to the automatic conversion of Class A Stock into Class B Stock upon the sale of such shares or upon the death of Mr. Smith.

31. Under the 1991 Shareholders Agreement, Decedent could give or bequeath his Class A Stock to his spouse, descendants, or family shareholders. Pursuant to Article VII of the Articles of Incorporation, however, all outstanding shares of Class A Stock, regardless of by whom held, automatically converted into shares of Class B Stock on a one-for-one basis upon Mr. Smith's death. Thus, other than Decedent, only his spouse or other family shareholders could hold Class A Stock, and then only during Decedent's lifetime.

32. At the time of his death, Decedent could sell Class A Stock only subject to a right of first refusal in Messrs. Imlay and Brown, and then the Company. Prior to any such sale, this right of first refusal required Decedent to first obtain a bona fide written offer from a non-affiliated third party and then offer such shares for sale to Messrs. Imlay and Brown and then the Company on the same terms and conditions as contained in the third party offer. In the event of a sale, whether to a third party purchaser or to Messrs. Imlay and Brown, under Article VII of the Company's Articles of Incorporation, the shares would automatically convert into shares of Class B Stock on a one-for-one basis and the shares would remain subject to the terms and conditions of the 1991 Shareholders Agreement. Further, any sale of more than 10% of Decedent's Shares in a non-public offering was subject to co-sale rights, at the same price and on the same terms, held by the other shareholders of the Company.

33. Under another provision of the 1991 Shareholders Agreement, all sales of shares of the Company's stock other than Decedent's Class A Stock were subject to a right of first refusal in favor of the Company and the other shareholders. Under this provision, prior to any such sale, the selling shareholder was required to first obtain a bona fide written offer from a

third party and offer in writing to sell such shares first to the Company and then to the other shareholders on the same terms and conditions as contained in the third party offer. Again, the transferred shares would remain subject to the terms and conditions of the 1991 Shareholders Agreement.

34. Under the 1991 Shareholders Agreement, all shareholders had preemptive rights to purchase any additional shares issued by the Company in such proportion as to preserve their relative equity positions.

35. The 1991 Shareholders Agreement stipulated that it was subject to the Constitution and Bylaws of the National Football League and the NFL Management Council, as well as certain decisions, rulings, resolutions and actions of, and other matters addressed by, the NFL.

36. The 1991 Shareholders Agreement guaranteed Messrs. Imlay and Brown one seat each on the Company's board of directors. The Agreement also gave Messrs. Imlay and Brown certain ownership privileges, including (a) the right to travel with the team to and from regularly scheduled "away" football games; (b) the right to use and access the owner's suite at all football games; (c) the right to visit the training facilities at any reasonable time; and (d) five box suite tickets to each regularly scheduled home game.

37. The 1991 Shareholders Agreement provided that it could not be amended or modified without the consent of the holders of at least 95% of the outstanding common stock of the Company.

38. Upon Decedent's death on October 26, 1997, pursuant to Article VII of the Company's Articles of Incorporation, all of the 13,050 issued and outstanding shares of Class A Stock automatically converted into shares of Class B Stock on a one-for-one basis. Thus, upon

Decedent's death, the Estate owned 12,424 shares of Class B Stock, subject to the restrictions in the 1991 Shareholders Agreement. Ownership of the Company's stock upon Decedent's death was as follows:

| Shareholder | Class B Common Stock | |
|---|---|---|
| | Shares | Percent |
| Estate of Rankin M. Smith, Sr. | 12,424 | 32.652% |
| Taylor W. Smith, his children and trusts for their benefit | 5,141 | 13.511% |
| Karen Smith Owen | 5,019 | 13.191% |
| Dorothy A. Smith Knox, her children and trusts for their benefit | 4,460 | 11.721% |
| Carroll S. Walraven, her children and trusts for their benefit | 4,380 | 11.511% |
| Rankin M. Smith, Jr., his children and trusts for their benefit | 2,060 | 5.414% |
| John Imlay | 2,283 | 6.000% |
| Tom Watson Brown | 2,283 | 6.000% |
| TOTAL | 38,050 | 100% |

39. Following Decedent's death, the Estate retained an independent appraiser, Houlihan Lokey Howard & Zukin ("Houlihan Lokey"), to determine the fair market value of Decedent's Shares for purposes of preparing the federal estate tax return. Houlihan Lokey concluded that the fair market value of Decedent's Shares as of October 26, 1997 was $25,370,000, and this value was reported on the Estate's Original Return.

40. The Service retained Willamette Management Associates ("Willamette") to appraise Decedent's Shares. Willamette concluded that the fair market value of Decedent's Shares was $48,685,020. The tax deficiency asserted by the Service is based in large part on

Willamette's conclusion. In valuing the Shares, however, Willamette applied erroneous comparisons and formulae, and committed numerous other errors, including, but not limited to, incorrectly valuing the Shares as if they were Class A Stock when the Estate held only Class B Stock and failing to apply appropriate discounts for the lack of control and lack of marketability inherent in the Shares.

41. The Estate subsequently retained a second independent expert, Standard & Poor's Corporate Value Consulting ("Standard & Poor's"), to review the appraisals of the Shares performed by both Houlihan Lokey and Willamette. In 2002, based on its review of and the information in those appraisals, Standard & Poor's preliminarily concluded that the fair market value of the Shares as of October 26, 1997 was approximately $20 million. The Estate's Second Claim for Refund seeking a further reduction in the value of the taxable estate of approximately $5.5 million was based on this preliminary conclusion.

42. In connection with its refund suit, the Estate retained Duff & Phelps, LLC (which had acquired Standard & Poor's) to perform its own independent valuation and to provide its expert opinion with respect to the fair market value of the Shares as of October 26, 1997. Duff & Phelps preliminarily determined that the fair market value of the Shares as of October 26, 1997 was $19 million.

43. Accordingly, the amount of Decedent's taxable estate is properly determined based on a $19 million fair market value of the Shares.

**Falcons Nest I, Ltd.**

44. At the time of his death, Decedent owned a 1% general partnership interest and a 70% limited partnership interest in Falcons Nest, a Georgia limited partnership formed on June 30, 1978. The Nest, Inc. ("TNI"), a Georgia corporation, was the other general partner, also

owning a 1% general partnership interest. Decedent owned all of the outstanding shares of TNI, and TNI's sole asset at the time of Decedent's death was its 1% general partnership interest in Falcons Nest. The remaining limited partnership interests were held by eight other limited partners, none of whom owned more than a 4% interest and four of whom were unrelated third-parties.

45. The principal assets of Falcons Nest as of Decedent's death were properties comprising the Atlanta Falcons training facility, including land, a motel and health club facilities, and an office building (the "Training Facility Property").

46. As of October 26, 1997, Falcons Nest had total liabilities of $11,543,811. These liabilities consisted of advances from the Company totaling $6,105,000, a demand note owed to SunTrust Bank for $2,820,000 that Decedent personally had guaranteed, and advances from limited partners totaling $2,618,811. These liabilities exceeded the value of Falcons Nest's assets.

47. Because the liabilities of Falcons Nest exceeded the value of its assets at the time of Decedent's death, Decedent's direct and indirect interests in Falcons Nest had no value. Rather, by virtue of Decedent's status as the only general partner with any assets, the liabilities of Falcons Nest were deductible as claims against the Estate to the extent they exceeded the value of Falcons Nest's assets. The extent to which Falcons Nest's liabilities exceeded its assets was dependent on the fair market value of its assets.

48. In a Report dated July 23, 1998, Childers Associates ("Childers"), an independent appraiser experienced in valuing Atlanta metropolitan area commercial real estate, concluded that the fair market value of the Training Facility Property as of October 26, 1997 was $6,710,000. Falcons Nest's remaining assets, consisting of accounts receivable, inventory,

equipment, and cash, were valued at $762,499, resulting in a total asset value for Falcons Nest of $7,472,499. Falcons Nest's liabilities totaled $11,543,811, so that, as of October 26, 1997, its liabilities exceeded its assets by $4,071,312 ($11,543,811 minus $7,472,499). This personal liability of the Decedent as a general partner of Falcons Nest was reported on the Original Return as a debt of Decedent, reducing the taxable value of the Estate by that amount.

49. The Service asserted that the fair market value of the Training Facility Property as of October 26, 1997 was $8,203,000. As a consequence, the Service asserted that the total asset value of Falcons Nest was $8,965,499 ($8,203,000 plus the $762,499 in assets detailed in paragraph 48 above), and that, as of October 26, 1997, Falcons Nest's liabilities exceeded its assets by only $2,578,312 ($11,543,811 minus $8,965,499).

50. The Service's value of the Training Facility Property is not based on an independent expert appraisal, but simply on incorrect adjustments made by the Service to Childers' valuation, as set forth in an Engineering and Valuation Report, dated March 30, 2001. In making its adjustments, the Service committed numerous errors, including, but not limited to, failing to view or consider the poor interior quality of the facilities, valuation of the facilities based on use as office space without considering the need for extensive renovations to correct the lack of windows and poor quality of the facilities, consideration of sales of property not comparable to the Training Facility Property, failure to consider negative physical features of the land, and failure to consider relevant competitive market conditions.

51. Beginning in October 1999, Falcons Nest undertook to sell the Training Facility Property. The Training Facility Property remained on the market until February 2007, when it was finally sold for $7,250,000.

52. As a result of its erroneous determination of the fair market value of the Training Facility Property and the resulting determination that Decedent's personal liability as a general partner of Falcons Nest was $2,578,312, rather than $4,071,312 as reported by the Estate, the Service incorrectly increased Decedent's taxable estate by $1,493,000 ($4,071,312 minus $2,578,312).

**COUNT II**

**DEDUCTIONS FOR ADMINISTRATION EXPENSES**

53. The Estate repeats and realleges each and every allegation contained in paragraphs 1 through 52 of the Complaint as if fully set forth herein.

54. In computing the value of a taxable estate, Section 2053 of the Code permits an estate to deduct its administration expenses.

55. On the Original Return, the Estate claimed deductions for funeral expenses and administration expenses totaling $2,976,820.89. These expenses included administration expenses paid or incurred at the time the Original Return was filed in January 1999 and preliminary estimates at that time of additional administration expenses to be paid or incurred in the future.

56. The Estate's Refund Claims claimed a deduction for administration expenses of $7,360,733 in addition to the previously claimed $2,976,820.89, and also included a request that the amount of its final tax obligation be determined by allowing as deductions all administration expenses actually paid or incurred through the final winding up of the Estate. The additional amount in the Estate's Refund Claims consisted of $6,347,452 of administration expenses the Estate had paid or incurred between the filing of the original return and the Second Refund Claim, and $1,013,281 of administration expenses that the Estate estimated at the time of the

Second Refund Claim would be paid or incurred through the time the Estate completed its administration and distributed all remaining assets to the Estate's beneficiaries. These administration expenses included additional interest expense (including interest on tax deferred under Section 6166 of the Code), additional attorneys' fees (including those related to a will contest), additional appraisal fees, additional accounting fees, and other expenses related to the administration of the Estate and preservation of its property.

57. The Service erroneously failed to allow the Estate's claimed deduction for administration expenses paid or incurred or reasonably estimated to be paid or incurred prior to the winding up of the Estate.

58. As of the date hereof, the Estate has paid or incurred administration expenses of at least $14,352,098.92, an amount in excess of the combined amounts previously claimed. The Estate will necessarily continue to incur additional administration expenses in connection with pursuing its Claims for Refund and this litigation. The Estate is entitled to deductions under Section 2053 with respect thereto and hereby claims allowance thereof.

WHEREFORE, the Service incorrectly valued the taxable estate, and thus incorrectly determined the amount of tax and deficiency interest owed by the Estate. The Service also incorrectly disallowed deductions for the total administration expenses paid or expected to be incurred by the Estate. The Estate is entitled to a refund of all overpayments of tax and deficiency interest (i) based on the correct valuation of its assets, and (ii) taking into account deductions for the total administration expenses paid or incurred by the Estate, together with interest on the overpayments, attorneys' fees and costs of suit, and such other amounts as are legally refundable.

**PRAYER FOR RELIEF**

WHEREFORE, the Estate of Rankin M. Smith, Sr. prays that this Court enter its Order:

1. Granting the Estate judgment against the United States of America for the Estate's overpayment of federal taxes and deficiency interest in the amount of $17 million, or such greater amount that the Court determines is legally refundable, together with interest thereon as provided by law, and the costs, expenses and disbursements of this action;

2. Granting the Estate judgment against the United States of America for the as yet undetermined amount of overpayment of estate taxes and deficiency interest that will be attributable to the additional estate tax deductions allowed for administration expenses paid or incurred by the Estate through the conclusion of this action; and

3. Directing payment of the Estate's costs, attorneys' fees and expenses, and such other and further relief to which the Estate may be entitled.

Respectfully submitted this 19th day of September, 2007.

Judith A. Mather (Attorney of Record)
Tel: (202) 776-2714
Fax: (202) 776-4714

Richard L. Braunstein
Bernard J. Long, Jr.
A. L. Bertoldo

DOW LOHNES PLLC
Suite 800
1200 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 776-2000
Fax: (202) 776-2222

COUNSEL FOR THE ESTATE